**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| Ashley Ford<br>137 Lincoln Ave.<br>Cuyahoga Falls, OH 44221 | Civil Action No.: 5:17-cv-49 |
| | Judge: Sara Lioi |
| David West<br>1001 Elm Avenue<br>Columbia, SC 29205 | |
| | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| Samantha Binnie<br>430 5th Ave SE,<br>St. Cloud, MN 56304 | |
| | **JURY DEMAND ENDORSED HEREIN** |
| Lindsey Jones<br>640 NE Grattan St.<br>Topeka, KS  66616 | |
| Jeremy Zimmerman<br>5626 Water Mills Drive<br> Milford, OH 45150 | |
| Marisa Burns<br>2113 Stabler Rd.<br>Akron, OH 44313 | |
| Sarah Repass Freund<br>3715 N. Valdosta Rd.<br>Apt. 201<br>Valdosta, GA 31602 | |
| Alyssa Pandolfi<br>671 Vernon St, Apt 103<br>Oakland, CA 94610 | |
| Maggie A. Webb<br>88 Harlow St.<br>Arlington, MA 02474 | |
| Ben Owen<br>2422 College St.<br>Cedar Falls, IA. 50613 | |

Melinda Morales (nee Hopkins)
1832 105th Ave
Oakland, CA 94603

Linda Repetz Werner
240 Willow Rd.
Fleetwood, PA 19522

Alexandra Bolden
621 Trumpet Court
Chesapeake, VA 23323

On behalf of Themselves and all Others
similarly situated,

    Plaintiffs,

v.

Pennsylvania Higher Education Assistance
Agency d/b/a FedLoan Servicing
C/O CT Corporation System Dauphin
116 Pine Street, Suite 320
Harrisburg, PA 17101

United States Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202

    and

Elisabeth DeVos, *in her official capacity as
Secretary of Education*,
400 Maryland Avenue, S.W.
Washington, D.C. 20202

    Defendants.

## COMPLAINT FOR MONETARY AND INJUCTIVE RELIEF

The above captioned Plaintiffs, by their undersigned counsel, file this Class Action

Complaint on behalf of themselves and all others similarly situated (the "Class" as defined

below) against the Department of Education, Betsy DeVos, in her official capacity as Secretary

of Education, (collectively, "DOE" or "Department of Education") and the Pennsylvania Higher Education Assistance Agency d/b/a FedLoan Servicing "PHEAA" or "FedLoan") (collectively, "Defendants"). All allegations herein, other than those relating directly to Plaintiffs, are based on information and belief.

## **INTRODUCTION**

1. This action seeks to protect teachers. Teachers are a vital centerpiece to the success and growth of this country. The strength of every profession grows out of the knowledge and skills that teachers instill in our country's youth. Yet, teachers are too often underappreciated, undercompensated, and undervalued. Worse, teachers are being taken advantage of and cheated by the Department of Education and PHEAA.

2. Recognizing the need for teachers in high-need subject areas at low-income schools, Congress established the Teacher Education Assistance for College and Higher Education (TEACH) Grant program under the College Cost Reduction and Access Act.[1] The TEACH Grant program awards financial grants to college students who agree to teach in the high-need subject areas at these low-income schools for four years. If, for some reason, a student participating in the TEACH program chooses not to fulfill their obligation, the grant is converted into a loan.

3. The DOE hired PHEAA to be the exclusive servicer of the TEACH grants beginning in July 2013. As of June 30, 2015, PHEAA was servicing about $444.5 million in TEACH Grants.

4. While in college or graduate school, a student could enroll in the TEACH Grant program by signing an Agreement to Serve. (See Exhibits A & B).

---

[1] *See* 20 U.S.C. § 1070g-2.

5. Pursuant to these Agreements to Serve, Plaintiffs were to send certifications verifying their employment at a low-income school as described in ¶ 2.

6. As TEACH administrator, PHEAA was obligated to receive certain certifications from teachers verifying compliance with their obligations under the TEACH Grant program and ensure that the Government also held up their end of the bargain.

7. Rather than properly administering these grants, Defendants instituted a fraudulent and deceptive pattern and practice of converting grants into interest-bearing loans, despite the fact that TEACH Grant recipients fulfilled and continue to fulfill their teaching obligations in these high-need fields and low-income schools in compliance with their TEACH obligations.

8. Worse, once notified about its wrongful conversion of a TEACH grant to a loan, Defendants further fail to honor the TEACH Grants – and further breach their TEACH plan-related duties and obligations – by refusing to convert the loan back to a grant and failing to offer any recourse for these teachers as they continue to honor their teaching obligations.

9. As a result of Defendants' wrongful conduct, Plaintiffs and the other Class members are saddled with improperly converted, interest-bearing loans, on which PHEAA requires them to make monthly payments, even though they continue to fulfill their teaching obligations.

10. PHEAA has abused, and continues to abuse, the TEACH Grant program, the teachers, and the education system in order to increase the value of its portfolio and, commensurately, to increase its profits at the expense of Plaintiffs and other Class members, who have held up their end of the bargain only to be cheated by PHEAA for its

own financial gain. Plaintiffs and the other Class members have been damaged by PHEAA's unfair, deceptive, and illegal conduct in an amount to be determined at trial.

11. Defendants' illegal conversions can fall into one of two categories.

*Unlawful Conversion Type 1*

12. The first type of conversion illegally employed by Defendants deals with the annual certifications that the teachers are to submit to Fedloan. The requirements of the "annual certification" require the TEACH Grant recipient to "provide my TEACH Grant servicer with documentation of that service on a form that will be available from my TEACH Grant servicer. This documentation must be completed "every year." However, the terms "year" and "annual" are not defined. The annual certification language in the Agreement to Serve does not require the TEACH Grant recipient to submit "annual" certification within the "school year" as defined by the Agreement to Serve, but simply requires the "annual" certification to be completed "every year" after the completion of each school year. Defendants arbitrarily created deadlines for these certifications and unscrupulously converted teacher's Grants because of a missed arbitrary deadline, despite the teachers continuing to teach in the targeted districts.

*Unlawful Conversion Type 2*

13. The second type of unlawful conversion is when Fedloan switches Plaintiffs to a "paperless" option without their knowledge. In certain cases, Fedloan would send correspondence by regular mail or personal email, but only send reminders about the yearly certification through this "paperless portal" without the teacher's knowledge and without notifying them. The Agreement to Serve (examples attached as Exhibit A and B) states that these certification forms are to be available through the Department. In some

cases, without the Teacher's knowledge, FedLoan would switch from regular mailing or sending them to teachers via their personal emails of these forms to paperless mailing through Fedloan's "paperless portal." Thus, certain plaintiffs would receive no notification of the certification forms until after the form was already deemed late by Defendants, resulting in the Grant being converted to a loan while the teachers continued to teach in the targeted districts.

### INDIVIDUAL PLAINTIFF ALLEGATIONS

*Type 1 Conversions*

### Plaintiff Ashley Ford

14. Ashley Ford entered into the TEACH Grant program on September 2, 2009 while she was working on her master's degree at Kent State University.

15. In order to receive a TEACH Grant, Ms. Ford executed a TEACH Grant Agreement to Serve, which sets forth the parties' rights and obligations under the TEACH Grant program. A true and accurate copy of her agreement is attached as Exhibit A hereto.

16. Ms. Ford received $7,000 in Grants over three years under the TEACH Grant program.

17. In exchange for the $7,000 in grants, Ms. Ford agreed to teach:

    a. in a high-need field;

    b. at an elementary school, secondary school, or educational service agency that serves students from low-income families;

    c. for at least four complete academic years within eight years after completing (or ceasing enrollment in) the course of study for which she received the grant.[2]

---

[2] *Id*.; (Exhibits A, B).

18. Additionally, Ms. Ford agreed to "submit evidence of such employment in the form of a certification by the chief administrative officer of the school upon completion of each year of such service."[3] ("certification paperwork").

19. If Ms. Ford failed to satisfy her teaching obligation, the TEACH Grant would be converted to an unsubsidized loan that the she would be required to pay back, with capitalized interest accruing from the date the TEACH Grant was initially disbursed to her.

20. It is not in dispute that Ms. Ford has met all of her teaching requirements as outlined in her TEACH Grant Agreement to Serve.

21. After her completion of her program, Ms. Ford submitted certification of her employment and intentions to fulfill her obligations within 120 days.

22. Ms. Ford is a special education teacher at Stanton Middle School in Kent, Ohio.

23. Stanton Middle School is and was designated as a low-income school by the Annual Directory of Designated Low-Income Schools for Teacher Cancellation Benefits. (*See* page 2 of Exhibit A)

24. Special education is a high-need field, as specifically enumerated in Ms. Ford's Agreement to Serve. (*See* page 3 of Exhibit A.).

25. In her second to last year of serving under the Grant, PHEAA, through their servicing entity, FedLoan, fraudulently converted her grants into loans for allegedly failing to submit her certification paperwork.

26. Ms. Ford received her certification paperwork while on maternity leave, which required her to ask a co-worker to get the paperwork, take it into school to get her principal's signature, and return it to her, which she did.

---

[3] *Id.* at § 1070g-2(b)(1)(D).

27. Ms. Ford was caring for her new born child and she inadvertently left a single signature from the paperwork.

28. Thus, FedLoan had actual knowledge of her intention to continue fulfilling her obligations under the TEACH Grant.

29. FedLoan Servicing mailed her new paperwork, informing her that she would need to complete and submit all new paperwork rather than simply returning her old paperwork so that she could add the one missing signature. When she received the second set of paperwork, she was still on maternity leave.

30. She faxed the second set of paperwork to FedLoan as soon as practical due to her maternity leave and spoke to someone by phone at FedLoan who assured her that it would not be an issue.

31. However, due to this minute inadvertence in her first set of paperwork, and contrary to the assurances that she received, FedLoan converted her Grants into Loans in December of 2014, despite having actual notice that Ms. Ford was continuing to comply with the material terms of her Agreement to Serve.

32. Ms. Ford immediately spoke with a representative at FedLoan about her situation and they informed her that she should send a dispute letter. On January 9, 2015, she sent a dispute letter and spoke with a representative that informed her that she would be contacted after her case was reviewed and a decision was made.

33. On April 6, 2015, she called FedLoan to inquire about the status of her case. She was told that the representative at FedLoan who had received her dispute letter had not submitted it correctly; therefore, it had never been reviewed. The new representative corrected the mistake while she was on the phone with Ms. Ford and stated that she

should "receive information about her case within thirty days, although it sometimes takes longer."

34. On June 11, 2015, Ms. Ford called FedLoan again to check on the status of her dispute and was told that it was still under review. On July 2, 2015, she called FedLoan and was told that her dispute was denied, although she was never notified of this. The representative that she spoke with asked that she submit paperwork verifying that she was in fact on maternity leave when her original paperwork was due.

35. On July 13, 2015, Ms. Ford faxed paperwork regarding her time off of work and was told that she should receive a decision within thirty days, which she did not.

36. FedLoan has still not converted her Loans back into Grants even though Ms. Ford has done everything that has been asked of her, including, most importantly, continuing to fulfill her teaching obligation. In fact, Ms. Ford has completed her four-year teaching obligation as outlined in the Agreement to Serve and continues to teach in a high-need field at Stanton Middle School, a low-income school.

37. Ms. Ford is now burdened not only with the repayment of a $7,000 loan but also with repayment of all accrued interest, which amounts to an additional $1,997.09.

38. Because of the burden of having to repay these loans, Ms. Ford has had to ask for a forbearance of the loan repayment, which will result in the continued accrual of interest.

39. This is a quintessential example of PHEAA's scheme to defraud teachers – wait for any minute mistake, then convert the Grant into a Loan – charging years of accrued interest, and then make it absolutely impossible to resolve the dispute, despite actual knowledge that a teacher is continuing to fulfill their obligations.

*Plaintiff David West*

40. Plaintiff David West entered into the TEACH Grant program on December 20, 2010, while he was a student at the University of South Carolina.

41. In order to receive the TEACH Grant, Mr. West executed a TEACH Grant Agreement to Serve, which sets forth the parties' rights and obligations under the TEACH Grant program. A true and accurate copy of his agreement is attached as Exhibit B hereto.

42. Mr. West received a $4,000.00 grant under the TEACH Grant program.

43. In exchange for the $4,000 in grants, Mr. West agreed to teach:

   a. in a high-need field;

   b. at an elementary school, secondary school, or educational service agency that serves students from low-income families;

   c. for at least four complete academic years within eight years after completing (or ceasing enrollment in) the course of study for which he received the grant.[4]

44. Additionally, Mr. West agreed to "submit evidence of such employment in the form of a certification by the chief administrative officer of the school upon completion of each year of such service."[5] ("certification paperwork").

45. If Mr. West failed to satisfy his teaching obligation, the TEACH Grant would be converted to an unsubsidized loan that the he would be required to pay back, with capitalized interest accruing from the date the TEACH Grant was initially disbursed to him.

46. It is not in dispute that Mr. West has met all of his teaching requirements as outlined in his TEACH Grant Agreement to Serve.

---

[4] *Id.* ; (Exhibits A, B).
[5] *Id.* at § 1070g-2(b)(1)(D).

47. Mr. West provided certification of employment within 120 days of completing his program for which he received the TEACH Grant.

48. Mr. West began teaching at White Knoll High School in August of 2012.

49. White Knoll High School is and was designated as a low-income school by the Annual Directory of Designated Low-Income Schools for Teacher Cancellation Benefits. (*See* page 3 of Exhibit B).

50. Mr. West teaches Art, which is and was a field listed in the Teacher Shortage Area Nationwide Listing. (*See* page 3 of Exhibit B).

51. Mr. West believes in the mission behind the TEACH Grant program, i.e. to provide high quality teaching to low-income schools that otherwise may not be able to recruit quality teachers such as Mr. West.

52. However, despite holding up his obligations under the Agreement to Serve, PHEAA improperly converted his Grant into an interest-bearing loan.

53. While filling out his certification paperwork, Mr. West also inadvertently left out a signature, and the Principal of his school inadvertently left out the start and end dates of the academic year that was being certified.

54. When Mr. West was informed of this, he immediately took action to correct the mistake and informed PHEAA that he was in fact continuing to uphold his obligations.

55. Despite PHEAA being aware of this information, it still improperly converted his Grants into Student loans, charging him with $809.14 in accrued interest and a principal balance of $4,000.

56. Mr. West is now burdened with the repayment of a $4,000 loan and the $809.14 in accrued interest, $62 per month over 10 years, despite the fact that Mr. West has

completed his four-year teaching obligation as outlined in the Agreement to Serve and continues to teach in a high-need field at White Knoll High School, a low-income school.

57. Mr. West also went through the torment that is working with PHEAA to no avail.

58. Mr. West exhausted all internal options through PHEAA and FedLoan, including working through FedLoan Servicing's Ombudsman Liaison line for the U.S. Department of Education Office of the Ombudsman. However, FedLoan concluded that the TEACH loan "cannot be transferred back to a Grant."

59. Because Mr. West continues to dispute the legitimacy of PHEAA's actions in improperly converting his Grants to Loans, and has refused, and continues to refuse to make payments on the improperly converted Loans, he has been threatened with wage garnishment, tax refund confiscation, legal action by the United States Department of Justice, and notification of default to the major credit bureaus.

*Plaintiff Maggie Webb*

60. Maggie Webb received a TEACH Grant in the amount of $4,000 in May/June of 2012.

61. On October 8, 2015, Defendants converted her TEACH Grant into an interest bearing loan after she had already performed two years of her obligation.

62. Ms. Webb provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

63. Ms. Webb continues to fulfill her obligation.

64. Defendants claim her Grant was converted for a failure to timely submit a certification form due to an arbitrary deadline created by Defendants.

65. However, Ms. Webb sent Defendants her certification form on August 7, 2015.

66. Ms. Webb then sent another form, which Defendants received November 19, 2015.

67. Even though Defendants had actual knowledge of Ms. Webb's intention to continue fulfilling her obligations, Defendants refused to reconvert her loan into a Grant.

68. Despite Ms. Webb continuing to fulfill her obligation by teaching Math at a low-income school, Defendants have converted her TEACH Grant into an interest bearing loan.

*Plaintiff Benjamin Owen*

69. Benjamin Owen received two TEACH Grants, one in 2011 and one in 2013, totaling $8,000.

70. Mr. Owen provided certification of employment within 120 days of completing his program for which he received the TEACH Grant.

71. On January 27, 2017, Defendants converted his TEACH Grant into an interest bearing loan.

72. Mr. Owen mailed his certification in December of 2016 and FedLoan acknowledged receipt of this on December 21, 2016.

73. Defendants claim the conversion was due to an arbitrary missed certification deadline in November of 2016, however, when the conversion happened; Defendants had actual knowledge of Mr. Owen's intent to fulfill his obligations.

74. Moreover, despite actual knowledge that Mr. Owen was continuing to fulfill his obligation, Defendants refused to convert the loan back into a Grant.

75. Now, Mr. Owen has been burdened with these incorrectly converted loans and cannot afford to pay for student loans due to the low base salary at this school that he decided to teach at because of the TEACH Grant incentives.

*Plaintiff Marisa Burns*

76. Marisa Burns received her TEACH Grant while completing her Master's degree in 2013, in the amount of $4,000.00.

77. Ms. Burns provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

78. On January 28, 2015, Defendants converted her TEACH Grant into an interest bearing loan.

79. Defendants claim that the loan was converted because Ms. Burns sent her certification paperwork in a couple weeks past an arbitrary October 26, 2014 deadline.

80. Defendants had actual knowledge that Ms. Burns was intending and was continuing to fulfill her obligations under the TEACH Grant.

81. Ms. Burns continues to teach at a low-income school and in June of 2017, will have completed her teaching obligations.

82. Despite actual knowledge that Ms. Burns fulfilled her end of the bargain, Defendants refuse to convert her loan back to a TEACH Grant.

*Plaintiff Jeremy Zimmerman*

83. Jeremy Zimmerman received a TEACH Grant on October 22, 2010, November 2, 2011, August 17, 2012, and August 24, 2013 in the amounts of $4,000, $4,000, $4,000, and $3,760, respectively.

84. Mr. Zimmerman provided certification of employment within 120 days of completing his program for which he received the TEACH Grant.

85. On October 05, 2016, Defendants converted Mr. Zimmerman's Grants into interest bearing loans.

86. On or about August 14, 2015, Mr. Zimmerman submitted his first annual certification without issue.

87. On or about October 10, 2016, Mr. Zimmerman submitted his second annual certification.

88. Defendants converted his Grant into a loan because this October 2016 certification was past an arbitrary deadline on or about August 24, 2016.

89. Moreover, Mr. Zimmerman could not have accurately certified his completion for the 2015-2016 year on August 24, 2016, as his contract for previous year was not completed until September of 2016, at which point he received his terms for the 2016-2017 academic year.

90. Despite having actual knowledge that Mr. Zimmerman intended to and was continuing to fulfill his teaching obligation, Defendants converted his Grant into a loan.

*Plaintiff Alexandra Bolden*

91. Alexandra Bolden received her TEACH Grant in 2012 in the amount of $4,000.

92. Ms. Bolden provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

93. In October 2016, the Defendants converted Ms. Bolden's TEACH Grant into an interest bearing loan.

94. Defendants claim that Ms. Bolden's conversion was due to a missed signature on the certification form.

95. Defendants informed Ms. Bolden in October that her Grant may be converted into a loan.

96. Ms. Bolden promptly sent an updated form, however her Grant was still converted.

97. Defendant PHEAA stated that Ms. Bolden was sent a notice in August that she had 30 days to complete this form; however Ms. Bolden was never mailed nor emailed this notification.

98. Despite having actual knowledge that Ms. Bolden intended to and continued to fulfill her teaching obligations, Defendants converted her Grant into a loan and refused to correct their error.

### Melinda Hopkins (FKA Melinda Morales)

99.  Melinda Hopkins received a TEACH Grant on June 23, 2010 in the amount of $4,000.

100.  Ms. Hopkins provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

101. On September 27, 2016, Defendants converted her TEACH Grant into an interest bearing loan.

102. Ms. Morales was completing her final year of the obligation and faxed the certification forms to Fedloan in June of 2016.

103. However, Fedloan never processed the certification forms nor did they send Ms. Hopkins any notification that they had not received it.

104. Instead, the loans were converted through Fedloan's paperless communications through its website.

105. Thus, again, pursuant to its scheme, PHEAA attempts to profit off of the hard work of teachers who are teaching in low-income schools in high-need fields who are attempting to mold children into successful adults.

### Plaintiff Samantha Binnie

106. Samantha Binnie received her TEACH Grants on January 15, 2010, June 10, 2010, and August 31, 2010 in the cumulative amount of $6,500.

107. Ms. Binnie provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

108. Ms. Binnie's Grant was converted to an interest bearing loan on February 1, 2017.

109. Ms. Binnie informed Fedloan around May or June of 2015 that she would be teaching at an orphanage in Colombia for the 2015-2016 school year.

110. The Fedloan representative stated that Ms. Binnie could fill out the required paperwork when she returned, "like taxes."

111. Upon returning, Ms. Binnie got information through the mail stating that her grants had been converted into loans and there was nothing she could do.

112. Ms. Binnie filled out a dispute form, but was denied.

113. Thus, Defendants had actual knowledge of Ms. Binnie's intention to continue satisfying her obligations under the Agreement to Serve and nevertheless converted her Grants into an interest bearing loan.

*Type 2 Conversions*

**Plaintiff Alyssa Pandolfi**

114. Alyssa Pandolfi received a TEACH Grant in August 22, 2014 in the amount of $3,468.80.

115. Ms. Pandolfi provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

116. On February 27, 2017, Defendants converted Ms. Pandolfi's Grant into an interest bearing loan.

117. Fedloan's notices to Ms. Pandolfi were given to her through her "paperless inbox" on Fedloan's website.

118. Interestingly, other information was mailed to her personal email address, but not the certification information.

119. There was no correspondence physically mailed to her address, despite the website erroneously stating that correspondence was physically mailed to her address.

120. Ms. Pandolfi has and is continuing to fulfill her teaching obligations by teaching 7th grade science at a low-income school.

121. Despite fulfilling her teaching obligations, Defendants have converted her Grant into an interest bearing loan.

122. Ms. Pandolfi informed Defendants of their mistake, but Defendants have refused to reconvert her Grant into a loan.

*Plaintiff Lindsey Jones*

123. Lindsey Jones received TEACH Grants on or about August 13, 2011 and August 11, 2012 in the cumulative amount of $8,000.

124. Ms. Jones provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

125. In August of 2016, Defendants converted Ms. Jones' Grants into interest bearing loans.

126. During her third year of fulfilling the teaching obligation, Fedloan switch Ms. Jones from paper billing to paperless billing without her permission.

127. Because she was switched from paper billing to paperless billing, Ms. Jones missed Defendants' arbitrary deadline to send certification forms.

128. Moreover, Defendants' arbitrary deadline pre-dates Ms. Jones' annual contract date. Thus, it would be impossible for Ms. Jones to certify by Defendants' arbitrary deadline.

129. Ms. Jones informed Defendants' of their mistake, but they refuse to rectify the situation.

### Plaintiff Linda Werner

130. Linda Werner received a TEACH Grant in or around November 2, 2015.

131. Ms. Werner provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

132. Defendants converted her Grant into an interest bearing loan on or around January 6, 2017.

133. Ms. Werner did not sign up for paperless communication and choosing paperless communication was not an option on any paperwork she submitted to Defendants.

134. Ms. Werner never received the paperwork to certify her employment.

135. Defendants could not provide Ms. Werner with an explanation as to how she was signed up for paperless communication.

136. Ms. Werner informed Defendants of their error and that she was indeed continuing to fulfill her teaching obligation, however Defendants refuse to convert the loan back into a Grant.

### Plaintiff Sarah Repass Freund

137. Sarah Repass Freund received a TEACH Grant prior to graduating in 2013.

138. Ms. Freund provided certification of employment within 120 days of completing her program for which she received the TEACH Grant.

139. Defendants converted Ms. Freund's Grant into an interest bearing loan around May of 2016.

140. Around May of 2016, Ms. Freund sent her final year of certification into Fedloan.

141. Ms. Freund never received correspondence regarding the certification because they were only sent through Fedloan's online account, which Ms. Freund had no knowledge that correspondence would be sent this way.

142. Fedloan responded to Ms. Freund stating that they had received her certification and will let her know when they made a decision.

143. Ms. Freund was told her Grants were converted to loans because she missed an arbitrary deadline.

144. Despite actual knowledge that Ms. Freund was completing her final year of her teaching obligations, Fedloan unscrupulously converted her Grant into an interest bearing loan.

## JURISDICTION & VENUE

145. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a civil class action, the aggregate amount in controversy exceeds $5 million exclusive of interest and costs, and diversity of citizenship exists between Plaintiffs and PHEAA.

146. Venue is proper here because PHEAA regularly conducts business in this District and a substantial part of the events giving rise to the claims occurred here pursuant to 28 U.S.C. § 1391(b)(2).

147. This Court has personal jurisdiction over PHEAA because PHEAA conducts business throughout the United States, including this District, has substantial contacts with this District, and has engaged in the illegal scheme explained herein that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business in this District.

148. This Court has original jurisdiction pursuant to 28 U.S.C.A § 1331 and 18 U.S.C.A. § 1964(c).

149. Venue is proper in this jurisdictional district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District and because PHEAA is subject to personal jurisdiction in this judicial district.

150. The Department of Education has waived sovereign immunity as to the relief requested in Counts II and III in this matter pursuant to 28 U.S.C. § 1346(a)(2).

151. Defendants' actions give rise to an actual controversy for purposes of Article III of the U.S. Constitution.

152. Venue is proper in this jurisdictional district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

153. Venue is also proper in this jurisdictional district pursuant to 28 U.S.C. § 1402(a)(1).

## PARTIES

*Plaintiffs*

154. Ashley Ford (f/k/a Ashley Cessna; "Ms. Ford") is an Ohio citizen residing at 137 Lincoln Ave., Cuyahoga Falls, Ohio, 44221. Ms. Ford was accepted into the TEACH Grant program and received $7,000 in grants. She began teaching at Stanton Middle School in Kent, Ohio in August 2006, and continues to teach there. FedLoan Services converted her grant into a loan on or around December 9, 2014. Despite holding up her end of the bargain for many years, FedLoan refuses to reconvert the loans to grants due to a minute technicality.

155. David West ("Mr. West") is a South Carolina citizen, residing at 1001 Elm Avenue, Columbia, South Carolina, 29205. Mr. West was accepted into the TEACH Grant program and received a $4,000 grant. He began teaching in August 2012 at White Knoll High School in Lexington, South Carolina, and continues to teach there. Mr. West's TEACH Grant was wrongfully converted into a loan on December 17, 2013. Mr. West has repeatedly attempted to resolve the problem with FedLoan, to no avail.

156. Samantha Binnie ("Ms. Binnie") is a Minnesota citizen, residing at 430 5th Ave SE, St. Cloud, Minnesota 56304. Ms. Binnie has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Binnie has attempted to resolve the problem with Defendants to no avail.

157. Lindsey Jones ("Ms. Jones") is a Kansas citizen, residing at 640 NE Grattan St., Topeka, Kansas. Ms. Jones has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Jones has attempted to resolve the problem with Defendants to no avail.

158. Jeremy Zimmerman ("Mr. Zimmerman") is an Ohio citizen, residing at 5626 Water Mills Drive, Milford Ohio 45150. Mr. Zimmerman has complied and continues to comply with all requirements of the TEACH Grant and his Agreement to Serve. Mr. Zimmerman has attempted to resolve the problem with Defendants to no avail.

159. Marisa Burns ("Ms. Burns") is an Ohio citizen, residing at 2113 Stabler Rd., Akron, Ohio. Ms. Burns complied with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Burns has attempted to resolve the problem with Defendants to no avail.

160. Sarah Repass Freund ("Ms. Freund") is a Georgia citizen, residing at 3715 N. Valdosta Rd., Apt. 201, Valdosta, Georgia 31602. Ms. Freund has complied and continues to

comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Freund has attempted to resolve the problem with Defendants to no avail.

161. Alyssa Pandolfi ("Ms. Pandolfi") is a California citizen, residing at 671 Vernon St., Apt. 103, Oakland, California 94610. Ms. Pandolfi has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Pandolfi has attempted to resolve the problem with Defendants to no avail.

162. Maggie Webb ("Ms. Webb") is a Massachusetts citizen, residing at 88 Harlow St., Arlington, Massachusetts 02474. Ms. Webb has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Webb has attempted to resolve the problem with Defendants to no avail.

163. Benjamin Owen ("Mr. Owen") is an Iowa citizen, residing at 2422 College St., Cedar Falls, Iowa 50613. Mr. Owen has complied and continues to comply with all requirements of the TEACH Grant and his Agreement to Serve. Mr. Owen has attempted to resolve the problem with Defendants to no avail.

164. Melinda Hopkins (f/k/a Melinda Morales) ("Ms. Hopkins") is a California citizen, residing at 1832 105th Ave., Oakland, California 94603. Ms. Hopkins has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Hopkins has attempted to resolve the problem with Defendants to no avail.

165. Linda Repetz Werner ("Werner") is a Pennsylvania citizen, residing at 240 Willow Rd, Fleetwood, Pennsylvania 19522. Ms. Werner has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Werner has attempted to resolve the problem with Defendants to no avail.

166. Alexandra Bolden ("Bolden") is a Virginia citizen, residing at 621 Trumpet Ct., Chesapeake, Virginia 23323. Ms. Bolden has complied and continues to comply with all requirements of the TEACH Grant and her Agreement to Serve. Ms. Bolden has attempted to resolve the problem with Defendants to no avail.

*Defendants*

167. Defendant PHEAA was created in 1963 by the Pennsylvania General Assembly and is an independent political subdivision, which is self-described as a governmental instrumentality, engaged in non-governmental commercial activity throughout the United States, including the state of Ohio. PHEAA is engaged in nationwide commercial student-loan financial services. Upon information and belief, PHEAA is registered to do business in the state of Pennsylvania, entity number 619191. PHEAA is financially independent of the state of Pennsylvania, generates its own commercial revenue, and makes its own fiscal and policy decisions.

168. Defendant PHEAA established FedLoan Servicing – which shares its headquarters with PHEAA at 1200 North Seventh Street, Harrisburg, Pennsylvania, 17102 – to support the U.S. Department of Education's ability to service student loans owned by the federal government. According to its website, FedLoan Servicing is the exclusive servicer approved by the U.S. Department of Education to service these loans, and it is "dedicated to supporting borrowers with easy and convenient ways to manage their student loans." [6]

169. Defendant United States Department of Education is a federal agency headquartered in the District of Columbia with its principal office located at 400 Maryland Avenue, SW, Washington, D.C. 20202.

---

[6] https://myfedloan.org/about/index.shtml (as of 9/7/2016).

170. Elisabeth DeVos is sued solely in her official capacity as Secretary of Education, in which capacity she has the ultimate responsibilities for the activities of the Department of Education, including the actions complained of herein. Secretary DeVos maintains an office at 400 Maryland Avenue, SW, Washington, D.C. 20202.

## FACTUAL ALLEGATIONS

171. "The U.S. Department of Education estimates that our country will need approximately 430,000 new elementary and secondary teachers by the year 2020, particularly in high-need subject areas such as mathematics, science, and special education."[7]

172. The TEACH Grant program, established by the College Cost Reduction and Access Act, was created to attract and retain qualified teachers for high-need subject areas at low-income schools.[8]

173. Pursuant to federal statute, a TEACH Grant assists students in paying for the cost of their education by providing grants of up to $4,000 per year to students who are completing or plan to complete course work needed to begin a career in teaching and who agree to teach in a low-income school in a high-need field. Undergraduate students are eligible for a maximum of $16,000 in grants, while graduate students can receive up to $8,000 in TEACH Grants. As of 2015, more than $593 million in grants have been awarded since the start of the program.[9]

174. High-need fields include bilingual education and English language acquisition, foreign language, mathematics, reading specialist, science, and special education, as well as any other field that has been identified as "high-need" by the federal government, a state

---

[7] U.S. Gov't Accountability Office, GAO-15-314, Higher Education: Better Management of Federal Grant and Loan Forgiveness Programs for Teachers Needed to Improve Participant Outcomes, 1 (2015) (hereinafter "GAO-15-314").
[8] *See* 20 U.S.C. § 1070g-2.
[9] GAO-15-314.at pg.8.

government, or a local education agency, and that is included in the annual Teacher Shortage Area Nationwide Listing (Nationwide Listing).[10]

175. In order to receive a TEACH Grant, individuals must sign a TEACH Grant Agreement to Serve, which sets forth the parties' rights and obligations under the TEACH Grant program. A true and accurate copy of such an agreement is attached as Exhibit A hereto.

176. For example, pursuant to the TEACH Grant contract, individuals agree to teach:

    a. in a high-need field;

    b. at an elementary school, secondary school, or educational service agency that serves students from low-income families;

    c. for at least four complete academic years within eight years after completing (or ceasing enrollment in) the course of study for which you received the grant.[11]

177. Additionally, participants must "submit evidence of such employment in the form of a certification by the chief administrative officer of the school upon completion of each year of such service."[12] ("certification paperwork").

178. If a TEACH Grant recipient fails to satisfy his or her teaching obligation, that recipient's TEACH Grant is converted to an unsubsidized loan that the recipient must pay back, with capitalized interest accruing from the date the TEACH Grant was initially disbursed to that recipient.

### PHEAA'S Role as Loan Servicer

179. Student loan servicers are a crucial link between borrowers and lenders. Servicers – such as PHEAA – manage borrowers' accounts, process monthly payments, manage

---

[10] 20 U.S.C. § 1070g-2(b).
[11] *Id.* ; (Exhibits A, B).
[12] *Id.* at § 1070g-2(b)(1)(D).

enrollment in alternative repayment plans, and communicate directly with borrowers, including borrowers in distress.

180. The federal government contracts with loan servicers, such as PHEAA, to assist in administering TEACH Grants. PHEAA administers the TEACH Grants and handles payments, billing, and communications with the recipients. PHEAA's duties also include reminding TEACH Grant recipients when their paperwork is due. A Modification of Contract ("Modification") between the Department of Education and PHEAA, dated August 27, 2014, is attached as Exhibit C.

181. PHEAA can initiate the conversion of the grant into the loan. Almost all of the TEACH Grants – including all of the unsubsidized, interest-bearing loans at issue here – are administered by PHEAA.

182. Despite taking on this substantial responsibility and obligation, PHEAA has utterly failed to perform its duties as a loan servicer and to honor its obligations under the TEACH Grant program.

183. Among other things, PHEAA fails to adequately communicate with TEACH Grant recipients, fails to appropriately and timely notify recipients about their certification paperwork, and fails to appropriately determine whether grants should be converted to loans.

184. Rather than honoring the TEACH Grants when teachers are complying with their obligations, PHEAA intentionally, improperly, and illegally converts those grants into interest-bearing loans and refuses to reconvert the loan to a grant for those teachers holding up their end of the bargain. The conversion usually comes during the last two years of the teacher's four year obligation.

185. Many loan servicers, like PHEAA, are compensated by receiving a percentage of the unpaid balances of the loans they service. By converting TEACH Grants to loans, PHEAA increases the unpaid balance of loans it services, thereby illegally increasing its own revenues at the expense of Plaintiffs and other Class members.

186. Pursuant to the Modification, PHEAA is paid $1.05 to service each borrower in TEACH Grant status and $2.85 for Grants that have been converted to loans and are in repayment.[13]

187. Thus, PHEAA is incentivized to deny Certification Forms and wrongly convert the Grants into loans, despite actual knowledge that these teachers are materially performing their obligation.

***PHEAA's Pattern and Practice of Improper Conversions***

188. A 2015 U.S. Government Accountability Office ("GAO") report that analyzed servicer data for TEACH Grants found that more than one-third of the recipients had their grants converted to interest-bearing loans.[14]

189. As September 2014, at least 2,252 grants were erroneously converted to loans.[15]

190. PHEAA improperly converted TEACH Grants to loans where Defendant had actual knowledge that the Grant recipient was materially performing their obligations, relying on hyper-technical mistakes in the recipient's yearly certification form or by not providing the Grant recipient with a yearly certification form.

191. PHEAA commonly communicated with TEACH Grant recipients via U.S. Mail and electronic mail.

---

[13] Exhibit C at pg. 4.
[14] GAO-15-314.
[15] *Id.*

192. Further, additional servicer errors for improperly converted grants include converting the grant to a loan before certification was due, arbitrarily setting a due date for the certification, failure to give the recipient 45 days from the first notice to certify, or a failure to give the recipient a full year from graduation to certify teaching.

193. A prime example of PHEAA's illegal loan conversion conduct occurred at an elementary school in Idaho where every TEACH Grant recipient had his or her grant converted to a loan. In a rural Idaho elementary school of 32 certified teachers, seven teachers had received the TEACH Grant. *All* seven of those "grants" have been converted to unsubsidized loans.[16]

194. "[The U.S. Department of] Education established a dispute process to address concerns about TEACH Grants converted to loans in error, however, GAO found that [the U.S. Department of] Education and the servicer provide incomplete and inconsistent information to recipients about the availability of and criteria for disputing conversions. This is inconsistent with federal internal control standards that highlight effective external communication."[17]

195. A separate independent study similarly found that nearly 40% of all students who have been awarded TEACH Grants have had their grants converted into loans.[18]

196. This is not the first time that PHEAA has been accused of improperly servicing government loans. An ongoing False Claims Act case involves allegations of PHEAA

---

[16] Jennifer Zamora, *Feds Unfairly Convert Teacher Grants to Loans*, Idahoednews.org, May 26, 2014, available at: http://www.idahoednews.org/voices/feds-unfairly-convert-grants-to-loans/
[17] GAO-15-314
[18] *See* Tamara Hiler and Lanae Erickson Hatalsky, *TEACH Grant Trap: Program to Encourage Young People to Teach Falls Short*, Third Way, Jan. 13, 2015, available at: http://www.thirdway.org/memo/teach-grant-trap-program-to-encourage-young-people-to-teach-falls-short.

illegally inflating its loan portfolios to obtain higher subsidies from the federal government.[19]

### Defendants Failure to Reconvert Loans

197. Defendant further fails to provide any appropriate recourse for the victims of its erroneous conversions. Thus, Plaintiffs, and the other Class members are left with interest-bearing loans and no recourse.

198. Although Defendants supposedly provides a *de jure* appeal process, the *de facto* appeal process is nonexistent.

199. PHEAA erroneously tells recipients that once a grant is converted to a loan, it cannot be reinstated as a grant. PHEAA further fails to explain reasons that a conversion could be deemed erroneous, how the problem would be rectified, or the criteria considered in the adjudication process.

200. Worse, despite continuing to teach in high-need fields at low-income schools, because of PHEAA's illegal conversion activities, Plaintiffs and the other Class members are now forced to make monthly payments on their converted loans or face wage garnishments, tax refund confiscation, and negative credit reporting consequences.

201. Rather than properly service the TEACH Grants and adhere to the program, PHEAA is stifling the program's intent for its own economic interest and punishing teachers who continue to fulfill their TEACH Grant obligations.

202. Between the beginning of the TEACH Grant program in the 2008-2009 school year and October 2014, more than 112,000 students have received grants, and the number of students increased in the following years. However, after PHEAA began servicing the program in July 2013, participation in the program has been declining.

---

[19] *See U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014).

203. For example, in 2012 there were 20,670 undergraduate participants. In 2014, there were 17,055 participants, marking a 3,615 or a 17% participant decrease. In 2012, there were 18,471 graduate participants. In 2014, there were 16,089 participants, marking a 2,382 or roughly a 13% participant decrease.[20]

204. Plaintiffs and the other Class members are recipients of these TEACH Grants and agreed to fulfill their obligation to teach in these high-need fields at low-income schools. Plaintiffs and the other Class members fulfilled or are continuing to fulfill their teaching obligations.

205. PHEAA's improper conversions of these grants to interest-bearing loans has devastating consequences for Plaintiffs and the other Class members, including significant monthly payments and negative impacts on credit history.

## CLASS ACTION ALLEGATIONS

206. Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiffs bring this action on behalf of themselves and all others similarly situated. The class is defined as :

> All persons in the United States who received a TEACH Grant serviced by PHEAA and who submitted documentation demonstrating that they either 1) are fulfilling their obligation; or 2) have fulfilled their obligation, yet had their grant converted to an interest-bearing loan from July 2013 to present.

207. Excluded from the Class are PHEAA and its officers, directors, management, employees, subsidiaries or affiliates, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, PHEAA's counsel and their

---

[16]*See* GAO-15-314 at pg. 14.

families, Plaintiffs' counsel and their families, and governmental entities not named in this lawsuit.

208. Members of the class are so numerous and geographically dispersed that joinder is impracticable. Upon information and belief, there are thousands of Class Members as more than 2,000 grants have been improperly converted, at minimum. Further, the Class is readily identifiable from information and records maintained by Defendants.

209. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants. Plaintiff's claims and claims of the putative Class originate from the same fraudulent and unfair practices of PHEAA. If brought and prosecuted individually, the claims of each putative class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief. Plaintiffs would fairly and adequately protect the interests of the members of the putative class.

210. Defendants acted on grounds generally applicable to the entire Class, therefore injunctive relief is appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

211. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members. Questions of law and fact common to the Class include but are not limited to:

    a.  Whether PHEAA's conduct in fraudulently converting grants into loans violates the Racketeer Influenced Corrupt Organizations Act.

b. Whether the Department of Education's conduct breaches the contracts entered into by Department of Education and Plaintiffs;

c. Whether PHEAA's conduct constitutes unjust enrichment;

d. Whether Plaintiffs and the Class are entitled to recover compensatory, statutory, treble, and/or putative damages based on PHEAA's conduct alleged herein;

e. Whether Plaintiffs and the Class are entitled to injunctive relief enjoining Defendants from further engaging in unfair and deceptive practices alleged herein;

f. Whether Plaintiff and the putative Class are entitled to recover attorney's fees.

212. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, including legal and factual issues relating to liability and damages.

213. Defendants' conduct was generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

214. This class action is superior to any alternatives for the fair and efficient adjudication of this controversy. There will be no material difficulty in the management of this action as a class action. Class treatment will also permit the adjudication of relatively small claims by Class Members who otherwise could not afford to litigate the claim, such as those asserted herein. Prosecution as a class action will eliminate the possibility of repetitive litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively,

and without the duplication of effort and expense that numerous individual actions would produce.

215. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying judgments, establishing incompatible standards of law for Defendants.

216. Class action treatment also is superior to any alternative method to compensate the victims of Defendants' unlawful conduct – Plaintiffs and the proposed Class – for the injuries they have suffered as a direct result of Defendants' conduct.

## COUNT I

### RICO § 1962(c) – Against PHEAA Only

217. Plaintiffs incorporate and re-allege all other paragraphs in this Complaint by reference as though fully rewritten herein.

218. This Count seeks liability for PHEAA alone.

219. Defendant PHEAA is liable to Plaintiffs under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, ("RICO").

220. The Department of Education and PHEAA are a RICO **enterprise** as defined by 18 U.S.C. § 1961(4).

221. PHEAA is engaged in and its activities affect interstate commerce.

222. The Department of Education is engaged in and its activities affect interstate commerce.

223. PHEAA, and not the Department of Education, is the "**culpable person**" as defined by 1961(3) because it is a nongovernmental entity capable of holding interest in property.

224. PHEAA is associated with the RICO Enterprise.

225. PHEAA did conduct and participate in the conduct of the Enterprise through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Plaintiffs by illegally converting their loans despite actual knowledge of substantial compliance.

226. PHEAA or the Department of Education induced Plaintiffs to enroll in TEACH Grants and then illegally and intentionally later converted Plaintiffs' Grants to interest bearing loans due to minute and hyper technical reasons, arbitrary annual deadlines, and underhanded tactics like sending certification information via the Fedloan website so that Teachers would miss PHEAA's arbitrary deadlines.

227. This pattern of racketeering activity affects the Department of Education.

228. Specifically, Defendant committed mail fraud under 18 U.S.C.A. § 1341.

229. Defendant committed wire fraud under 18 U.S.C.A. § 1343.

230. Defendants fraudulently converted each of Plaintiffs' individual TEACH Grants as described *supra*.

231. PHEAA used U.S. Mail to further this fraudulent scheme.

232. PHEAA used the internet, email, and telephones to further this fraudulent scheme.

233. PHEAA's scheme to defraud consists of PHEAA knowingly converting TEACH Grants into loans despite actual knowledge that the Plaintiffs continue to fulfill their Qualifying Teaching requirements.

234. Moreover, PHEAA was monetarily incentivized to make these illegal conversions in furtherance of its fraudulent scheme.

235. The acts of fraudulently converting Plaintiffs', and thousands of other teacher's TEACH Grants into loans, set forth above, constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).

236. PHEAA did conduct and participate in the conduct of the Department of Education's affairs through a pattern of collection of unlawful debt by illegally converting their loans despite actual knowledge of substantial compliance.

237. The acts of fraudulently converting Plaintiffs' and thousands of other teacher's TEACH Grants into loans constitutes collection of an unlawful debt pursuant to 18 U.S.C. § 1962(c).

238. The scheme has been going on since 2013 and continues today.

239. These illegal conversions constitute at least two predicate acts in an ongoing fraudulent scheme.

240. Defendants are engaged in an open-ended scheme to fraudulently convert many TEACH Grants into interest bearing loans.

241. The illegal conversion of TEACH Grants into loans is part of Defendant's way of doing business.

242. PHEAA continues to fraudulently convert TEACH Grants into interest bearing loans.

243. PHEAA has directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above in violation of 18 U.S.C. § 1962(c).

244. Plaintiffs are each a "person" capable of holding a legal or beneficial interest in property.

245. As a direct and proximate result of the Defendant's racketeering activities and collection of unlawful debt, in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property because these Grants are now allegedly due and owing and have been accruing interest from when Plaintiffs signed the Agreement to Serve. (See Exhibit A and B).

246. Plaintiffs are entitled to damages, treble damages, punitive damages, attorney's fees, and costs for PHEAA's violations.

**COUNT II**

**Breach of Contract – Against the Department of Education**

247. Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

248. Plaintiffs and Class members entered into a contract with the Department of Education, titled Agreement to Serve. (Representative copies of the contract are attached as Exhibits A and B).

249. Within 120 days of ceasing enrollment in their Program for which the TEACH Grant was received, Plaintiffs confirmed their employment in writing to the Department of Education pursuant to Section C, Item 2(A).

250. Pursuant to Section C, item 1, of the contract each participant in the TEACH grant program agreed to fulfill a service obligation of teaching for four years in a low-income school, high need field, and meet the requirements for a high-quality teacher.

251. Plaintiffs and Class members have performed or substantially performed all material terms of their obligations under the contract.

252. Despite Plaintiffs and Class members substantially complying with the contract the Department of Education, through PHEAA, breached its contractual obligations by improperly converting the grants to interest-bearing loans.

253. As a proximate consequence of PHEAA's improper conduct in breaching the contract, the Plaintiffs and Class members suffered injury due to the improper conversion of the

TEACH Grant, which PHEAA and the Department of Education deem to be an interest bearing loan that Plaintiffs owe.

<h2 style="text-align:center">COUNT III</h2>

<h3 style="text-align:center">Unjust Enrichment – Against Both Defendants</h3>

254. Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.

255. PHEAA and the Department of Education have been unjustly enriched by receiving increased profits based on increased outstanding loan balances at the expense of Plaintiffs and Class members.

256. PHEAA and the Department of Education have been unjustly enriched by gaining qualified teachers in high-need areas.

257. PHEAA and the Department of Education have been unjustly enriched by increasing its portfolio by illegally converting the TEACH Grants at the expense of the Teachers who are fulfilling their obligations.

258. PHEAA and the Department of Education have knowingly, improperly, and unreasonably received and retained a benefit to the detriment of Plaintiffs and Class members. PHEAA's retention of these profits is inequitable.

259. As a proximate consequence of PHEAA's improper conduct, the Plaintiffs and Class members were injured. PHEAA has been unjustly enriched and retention of funds under these circumstances would be unjust without payment.

<h2 style="text-align:center">REQUEST FOR RELIEF</h2>

WHEREFORE, Plaintiffs and Class members pray that the Court:

A.  Certify this action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appoint Plaintiffs as Class Representatives and its counsel of record as Class Counsel;

B.  Permanently enjoin PHEAA from sending collection letters to Plaintiffs or any member of the class, converting any grant to a loan for any member of the class, filing negative information with any credit reporting agency with regard to Plaintiffs or any member of the class, or collecting any payment from Plaintiffs or any member of the class;

C.  Enter judgment for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, and penalties and other monetary relief provided by applicable law, including treble damages;

D.  For an order requiring PHEAA to institute a corrective review process to remedy PHEAA's wrongful conduct;

E.  Award Plaintiffs and Class members pre-judgment and post-judgment interest as provided by law, including that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

F.  Award Plaintiffs and Class members damages, treble damages, punitive damages, attorney's fees; and

G.  Award such other relief as the Court deems just and proper.


  Dated: May 4, 2017

                                    Respectfully submitted,
                                    DOUCET & ASSOCIATES CO., LPA


                                    s/ Troy J. Doucet_____
                                    Troy J. Doucet (0086350)
                                    *Attorney for Plaintiffs Ashely Ford et al.*

700 Stonehenge Parkway, 2B
Dublin, Ohio 43017
(614) 944-5219 PH
(818) 638-5548 FAX
Troy@Doucet.Law

**JURY TRIAL DEMANDED**

Plaintiffs respectfully request a jury trial on all triable issue.

s/ Troy J. Doucet_____
Troy J. Doucet (0086350)

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed with the Clerk of Courts using the ECF system, which will send notification of such filing to all attorneys of record on this 5th day of May, 2017.


*/s/ Troy J. Doucet*_____
Troy J. Doucet (0086350)